Good morning, Your Honours. May it please the court, my name is Chen Xiong Fan and I represent Petitioner Du Min in this appeal. Before I begin, I would like to reserve two minutes for rebuttal. Petitioner Du Min is a Christian and he fears persecution on account of his religion. Looking at the agency record, there is ample evidence to support the matter of Maharabi four-part test for well-founded fear of future persecution. Specifically, Respondent regularly attends a shelter's church in the United States and follows their teaching, even though he himself may not identify as a shelter. The Chinese government believes the petitioner is a shelter through the interrogation of Petitioner's sister, who was their mother. Your Honour, can I ask a question? So Mr. Du does not consider himself to be a shelter, is that what I heard you say? Your Honour, he may not necessarily consider himself to be a shelter. When asked about the doctrine of the church that he attends, his church's elders testified that they themselves do not consider them to be of a particular sect of Christianity. They just call them Christians, even though they acknowledge that outsiders call themselves the shelters. So it is reasonable to infer that the Respondent himself may not necessarily identify as a shelter, but there is evidence to suggest that he regularly attends the shelter's church and follows their teaching. There is a difference between what they conclude. I would support that specific issue because isn't there evidence that in China, I don't know if there's a heightened sense of persecution for shelters as opposed to Christians, but there does seem to be pretty ample evidence that in China, Christians in general face a pretty high risk of persecution. Yes, Your Honour, and there is a heightened threat of persecution for members of groups that the Chinese government considers to be not normal religions. This is reflected in the first page of the Department of Human Rights report. They noted that certain organizations that the Chinese government considers to be occult are of special heightened risk. This is also supported by numerous articles submitted by the petitioner detailing how shelter groups are specifically targeted by the Chinese government for mere possession of a Bible. Your Honour, the agency abuses its discretion by basing its decision on several fundamental misreading of the record or that the agency failed to examine the entire record. The agency's decision is also arbitrary and capricious because a key part of its decision conflicts with the implication of an earlier finding of the agency, namely that the agency first found the respondent to be a credible witness and then draws conclusions that it's inconsistent with that determination. Let me start with the most obvious mistake that the IJ made during trial. The IJ in its decision failed to find, stated that there's insufficient link between, there's insufficient evidence that the church the petitioner attended was a sheltered church. In support of his findings, the IJ specifically cited testimony from petitioner's church witness Elder Yao that Elder Yao did not consider themselves to be a sheltered church. However, Elder Yao later specifically testified that he specifically explained that he's aware that shelters is a name outsiders sometimes call them and even though they themselves call them Christians. Petitioner also explained during direct examination that shelters in the U.S. has a uniform way of naming the church. Specifically, the church is named by the city. For instance, the church in Alhambra, church in Torrance is just a church plus the city. This is consistent with the articles petitioner submitted in describing the local church movement. Another name the shelters are known as. Was there any evidence either from Yao? It sounds like Yao did not provide any testimony about how he thought China would interpret the church of Torrance, whether they would perceive it, the government would perceive it to be a sheltered church, or did he provide that testimony? He did not provide much testimony regarding how the Chinese government. What is the evidence that, because if Mr. Yao says hey we don't consider ourselves to be sheltered church, what is the evidence that the Chinese government perceived or would perceive them to be a sheltered church? This goes to the heart of my argument, Your Honor. The IJ found the petitioner to be credible in this case. This necessarily means that he believes the petitioner's recount of what happened to his sister in China. His sister attends a government-sanctioned church in China. She brought a version of the Bible that is specifically used by the shelters. This mere possession of the Bible triggered her arrest. Nothing else. Her pastor in the state-sanctioned church noticed that she brought this Bible and spoke with her and told her that this is a cult material. This Bible is used by the shelters. Because of this, she was arrested and detained for three days and even beaten during the interrogation. The Chinese government specifically stated during the interrogation that this material is shelters material. They told her that they suspected her of being a secret cult member merely for possessing this Bible. During the interrogation, her sister did reveal the situation with the petitioner that he attends a sheltered church in the U.S. In that case, she was detained for three days but then she was released. Yes. Is there other evidence of persecution of those in China who, I guess, would be carrying this recovery version of the Bible other than her? The petitioner did submit several articles detailing how other members of the shelters group were arrested for possessing the Bible or suspected of being a shelters member. This is in addition to the general Department of State human rights report condition of the country. Counsel, there was a reference in the agency's decision about lack of evidence that your client would continue to practice his religion or he would go to China. Do you know what the agency might have been referring to? In my review of the testament, I didn't see anything about your client testifying that if he went back, he would give up his religion. Was there anything in the record about that? No, Your Honor. The way I read the board's decision is that there is insufficient evidence of him. He was not specifically asked whether he would renounce his religion should he return to China, but he did testify after learning of the events that transpired. He grew more convicted of his church's teaching and that he would not withdraw from his religious activity. The way I read the board's decision is that there's not a specific direct question or answer whether he would continue to practice his faith or attend a non-government church should he return to China. Your gentle about a minute and a half. Do you want to reserve? Yes. Yes, Your Honor. All right. We'll hear from the government. Ms. Volkert. Good morning. Good morning, Your Honors. Good morning, counsel. Kathleen Volkert for the government. May it please the court. I'm just going to set my timer here. I don't have the review. Your Honor is here. The agency did not abuse its discretion when it denied petitioner's motion to reconsider. Petitioner did not show any error of law or fact within the agency's decision where it concluded that he did not demonstrate through sufficient record evidence eligibility for asylum or withholding of removal on account of his religious beliefs. A constant characterization I would have when I'm listening to petitioner's arguments. He seems to have a quarrel with the immigration judge's consideration of the evidence rather than pointing to any error committed that would render the agency's decision defective. Because I think I agree with your assessment that there wasn't a legal error, but isn't it an error for the IJ or I should say the BIA and also the IJ to the extent that the BIA adopts the IJ's opinion to fail to consider all of the evidence. That seems to be what the claim is here. To your question, when you review the record, I think, well, if you would indulge me, I think that the immigration judge and the board considered all the evidence. They cited to the documentary evidence, the testimony of the petitioner, the petitioner's witness. If you watch the immigration judge throughout the hearing, he's very, he appeared to be very engaged. He was asking questions. He had a full conversation with the witness, Elder Yao, about the different Bibles and the different translations or why his church chose to use the recovery Bible versus the King James Bible. And the witness said it was really because of the correct translation. And that's why they chose it. They talked about how now the new generation is using their phones. He uses the Bible, but it really wasn't like we use this recovery Bible because it is the only Bible the shouters use. So the judge really considered that information. And even at the end, the immigration judge alerted the petitioner's counsel that he was grappling with two issues. One, any corroboration with the sister's accounts regarding the detention. He was asking for more information on that. And then he also talked about the documents and talked about the claim that the church is a shouters church, the church of Torrance and also the Bible. And he was asking counsel, can you thread the needle for me? I know there are these documents and stuff. He even decided to run and sit in an apparent suggestion that he would give more time if she needed to get more information. It looked like he was really trying to tie these together or have counsel tie these together. And in the end, a point that counsel made that he said the judge indicated that his church of Torrance was not a shouters church. I don't think that the immigration judge made that determination. He didn't make that definitive finding. He basically said he just didn't find there was enough evidence being offered by the petitioner to show that he was going to encounter problems in China once he got there. Just because. Counsel, let me interrupt for a second. You don't quarrel with the fact that the Chinese government considers the shouters a cult. No, sir. I see it in the country reports, and I think that they do consider the shouters to be what they call an evil cult. Right. And so in the evidence of the record, the Chinese government, as I read the record, not only detained his sister, but also sent him a document where they wanted him to confess. Correct. Well, sir, I don't think they sent him a document. I think that was part of the immigration judge's concern was that we were just going off of the statement from the sister. And although admittedly, the immigration judge said he found the petitioner credible, petitioner's witness credible, he didn't have a problem with the statement. But I think the one dimensional statement without being able to question the sister about what exactly happened and what exactly the Chinese government or the officers of wanted him to write in a letter, he couldn't provide that information. Well, he said he wouldn't write the letter because they wanted him to implicate other people in the church and to confess. So there was no contrary evidence. So why don't we have the conclusion that even if this church is not technically a shouter church, which it probably is, that they perceived him to be a shouter and therefore even imputed this out? So I see your point, sir. And I agree that it doesn't necessarily matter if witness Yao said they don't consider themselves shouters. If China considers them shouters, you're kind of out of luck. I understand that. What I think that IJ was saying was that there was not enough evidence to show that one, if he went back to China, that he would encounter any problems. It didn't seem like he proved enough that, that the authorities were really after him. Counsel, it seems, it seems like the evidence that was presented all pointed in one direction that, I mean, setting aside the shouter, if you are carrying the recovery version of the Bible, you're presumed to be in a cult, you know, whether it's as a shouter or some other aspect in China. And that there seemed to be evidence to support that view. What was the evidence that would suggest that an individual could go to China, hold the recovery version of the Bible, make it public and not be subject to persecution? Well, your honor, I don't think that there's necessarily evidence supporting that. But what I do think the IJ relied on was the fact that it didn't necessarily, the record did not reflect that he had to have a recovery version. And I think if you look at the conversation, right. I mean, there's no dispute. No, it's not. Well, your honor, when he talked about why he bought the version for his sister in the church's gift shop, he didn't say I bought this because this is the recovery version that the shouters use, or that my churches, as he said, is it was, it's the, it's the revised version of the Bible we use. I think I'm paraphrasing. And he said it was exquisite. It was very nice. It was just the shelf. And then when the council, why does that matter? I mean, if they consider, I guess it matters. Sorry, your honor. Well, I mean, if, if, if Chinese government considers anybody who has this version of the Bible, a shouter, and they discriminate against shouters, why does it make any difference what his subjective motivations were? Well, I think it would be more of like, when you go to the point about the immigration judge and the board finding that there's not enough evidence to show that he wouldn't go, I guess, does he have to have that Bible? When you talk to elder Yao, is it when they had the discussion, the immigration judge noted that it wasn't, there's one Christian Bible, there's many versions, and that just happened to be the one they use, but it doesn't have to be the only version you use as a Christian in China. That's a very problematic argument, it seems to me, because it's sort of like the agency is saying, you don't have enough proof that you're going to be persecuted or treated badly because of your religion, because you could just change your religion. You could just read a version of scripture. You could just go to a different church. I mean, isn't that problematic? Well, it would be if that was what the agency was saying, but what the agency is saying is not that he has to change his religion, but just if you look at this discussion between the immigration judge and elder Yao on the record, it doesn't seem that it has to be that particular version. It just is a different translation, but they're all the Christian Bible, elder Yao said. He just preferred to use that because he felt that it was the most accurate, and they had further discussion. So, it's not saying, you know what, you should give up your religion and do something else. I think the evidence kind of reflects that it doesn't necessarily appear that he was seeking out to shatter religion alone. He was a Christian, and that if that's the case, then just because you returned to China, you didn't say you wouldn't attend the same church your sister attended, which is a government sanction. He didn't say that he'd have to go to an underground chowder church, and I think I'm getting too much into substantial evidence here. Can I ask one other question? Is the government contesting the fact that, you know, three days imprisonment, would that be a fear of future persecution if that was all that he was potentially subject to? Does the government contest that that would satisfy the standard for future persecution? Well, I think that when, I think the government agrees with the immigration judge's determination that her situation is most aligned with Gu, and that was a situation where someone was detained for three days based on their religion, and that was not found to be persecution. You're talking about past persecution. We're talking about, I think, oh, I'm sorry. I think someone's asking about why wouldn't that constitute evidence of a well-founded fear of future persecution? I think if there is evidence, I'm sorry. I really just am asking, I just want to know whether there's a dispute on this question. If there were evidence, let's say it was even stronger that the Chinese government sent him a letter and said, if you return back, you're going to be in prison for three days. Um, would the government's position be, well, who cares that that's not enough of a harm to be considered a fear of future persecution? Would that be the government? No, sir. I don't think so at all. And when you're talking about that, that's all, that's, I just wanted to make sure we didn't have an issue there. Okay. Thank you for your argument. We'll hear rebuttal. Ernest, I'd like to address the potential harm on the petitioner of my faith should she, he returned to China. He's not exactly situated with his sister. His sister attends a state sanctioned church. And after interrogation, she was cleared of being a sharder because there's, she has a history of attending that church. And she came forward to the pastor of the possession. It's pretty easy to clear her because to believe that she accidentally came upon this Bible. With regard to the petitioner, the Chinese police specifically threatened one year of jail time if he did not write a confession letter, which he did not do. And under any system of criminal law, distributing something that is forbidden is way worse of a crime than simply possessing of a crime. And this in combination of his refusal to withdraw from his religion would subject him to a much higher risk of a higher degree of harm than what his sister suffered. And with that, I have nothing further to add. Well, thank you both for your arguments. The case just argued for decision and we'll proceed to the next case on the oral argument calendar, which is Larios versus Lunardi.
judges: Thomas, Nelson, Hunsaker